FILED
MAY 1 8 2007
U.S. BANKRUPTCY COURT
FOR THE DISTRICT OF ARIZONA

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br>TURNER-DUNN HOMES, INC., and others,<br>　　　　　　　　　Debtors.<br><br>BCI BEBOUT CONCRETE, INC.,<br>　　　　　　　　　Plaintiff,<br>vs.<br>TURNER-DUNN HOMES, INC., et al., and John Does 1-10,<br>　　　　　　　　　Defendants.<br><br>ROBERT P. ABELE, Chapter 11 Trustee,<br>　　　　　　　　　Third-Party Plaintiff,<br>vs.<br>SONORAN CONCRETE, LLC, an Arizona limited liability company; GALE CONTRACTOR SERVICES, a Florida corporation; CHAS ROBERTS AIR CONDITIONING, INC., an Arizona corporation; DEL MARTENSON DEVELOPMENT CORP., an Arizona corporation; TRUSSWAY, INC. WEST, an Arizona corporation; TRIPLE S FENCE CO., an Arizona corporation; RIGGS PLUMBING, LLC, an Arizona limited liability company; ALLIANCE LUMBER, LLC, an Arizona limited liability company; KAY CONSTRUCTION, INC., an Arizona corporation, PEAK CONSTRUCTION, INC., an Arizona corporation; DIVERSIFIED ROOFING CORP., an Arizona corporation; INTEGRATED STUCCO, INC., an Arizona corporation; MITCHELL ELECTRIC CO., INC., an Arizona corporation; A COMPANY PORTABLE RESTROOMS INC., an | Chapter 11<br><br>Case No. 4-06-bk-00961-JMM<br><br>(Jointly Administered With Case Nos.: 4-06-bk-00962-JMM; 4-06-bk-00963-JMM; 4-06-bk-00964-JMM; 4-06-bk-00965-JMM)<br><br>Adversary No. 4-06-ap-00106-JMM<br><br>**MEMORANDUM DECISION RE:**<br><br>**SUMMARY JUDGMENT (PARTIAL)**<br><br>**INVOLVING LIEN CLAIMANT**<br><br>**RDC CONSTRUCTION, INC.** |

| 1  | Idaho corporation; JORDAN COMPANY; PACIFIC )
| 2  | POOLS AND SPAS, LLC, an Arizona limited )
|    | liability company; MARICOPA MEADOWS )
| 3  | HOMEOWNERS ASSOCIATION, an Arizona )
|    | corporation; SANDVICK EQUIPMENT & SUPPLY )
| 4  | CO.; ESCO ELECTRIC WHOLESALE, INC.; RDC )
|    | CONSTRUCTION, INC., an Arizona corporation; )
| 5  | DAYSPRING DEVELOPMENT, INC., an Arizona )
|    | corporation; OUTDOOR ENVIRONMENTAL )
| 6  | SYSTEMS, INC aka OES, INC. dba RAINDANCE )
|    | SYSTEMS, an Arizona corporation; OHIO )
| 7  | SAVINGS BANK, a federal savings bank; WRI )
|    | INVESTMENTS III, LLC, a Washington limited )
| 8  | liability company; ANY UNKNOWN PARTIES IN )
|    | POSSESSION; UNKNOWN HEIRS AND )
| 9  | DEVISEES OF ANY OF THE FOREGOING WHO )
|    | ARE DECEASED; and ABC ENTITIES 1-100, )
|    |                                              )
| 10 |         Third- Party Defendants             )

## INTRODUCTION - PROCEDURE AND METHODOLOGY

The Trustee has filed motions for partial summary judgment against numerous mechanics' and materialmen's lien claimants, challenging on "statutorily deficient" or "facially inadequate" grounds, the preliminary or final recorded lien documents of such lien claimants. In some cases, the lien claimants have also filed for partial summary judgment on the same issues.

For administrative convenience, the court has dealt with each lien claimant separately, although many of the same legal issues may affect other lien claimants as well. For that reason, many of the court's discussions and analyses may be repeated in whole or in part in its various decisions. Separating the decisions, as to each lien claimant, will enable both the court and each affected party to focus on particularized issues or fact differences, and will also facilitate appellate review.

When discussing the motions for summary judgment, the court will consider the points made against the particular lien claimant, and will include the totality of challenges to the lien, whether made by the Trustee, Ohio Savings Bank ("OSB"), or WRI Investments III, LLC ("WRI"), alone or in combination with one another.

In the end, the court will have addressed all challenges to the liens presented by the motions, and will rule on each legal point. In some instances, factual issues which were unforeseen at the outset may present themselves, and if so, the court will indicate which issues are to be deferred for future hearings.

With one eye open to the appellate process, the court does not intend to combine any ruling with Rule 54(b) language, because, if further proceedings become necessary, the matter may not be ripe for final review until it is finally determined. This will save counsel and any reviewing court the expense and time in taking and deciding interlocutory appeals.

Another tool which the court will use is a appendix to each decision, which will include each lien claimant's challenged lien documents. Due to size, each appendix will be separately filed within a few days subsequent to issuance of each decision. In this way, the parties, this court, and any reviewing court will having ready access to the operative documents involving each creditor. The appendix will also include the applicable Arizona statutes.

In some instances, a mechanic's lien claimant may have responded to the Trustee's motion and countered with its own summary judgment motion or partial summary judgment motion. When this procedure has occurred, the court will also rule on those issues unless the ruling is subsumed within the main decision.

To the extent that this decision requires refinement or further clarification, the court asks that the parties first convene a status hearing with the court prior to filing further pleadings on the decided issues. In that way, all parties can arrive at a unified method to further process the issues.

The court also understands that in many instances, the parties have not attached all or each of their claimed liens or notices. This is because all or each are essentially identical and a ruling on a particular legal issue is applicable across the board. Thus, the parties have selected samples for the court's review.

As noted from the bench, the court appreciates the excellent quality of the work product and arguments presented by all attorneys in this case. As all parties can appreciate, the issues presented were not simple ones, and the issues are important to the ultimate outcome of this case. For their efforts, the court thanks counsel in clearly focusing the issues.

## PREFACE

The issues involving RDC, the Trustee, and OSB or WRI differ somewhat from the issues affecting all, or most of the other lienholders. They involve, at least for the summary judgment phase of the case, actual dispositive issues concerning lien priorities. The issues presented in this case affect what the parties call "Parcel FF."

Both RDC and OSB seek summary judgment against one another. The court, after considering all of the pleadings, breaks the issues between them down into two major parts:

1. Are RDC's liens "facially defective?"
2. If not, is OSB entitled to priority notwithstanding its junior position, under the doctrine of "equitable subrogation?"

## FIRST ISSUE - WHETHER RDC'S LIEN CLAIMS ARE FACIALLY DEFECTIVE

The first issue with which the court must grapple deals with OSB's challenges to the form and substantive requirements of RDC's lien claim and preliminary lien notices. In this area, the challenges to RDC's lien fall into two categories:

1. Was the preliminary 20-day notice served upon OSB, and did it contain an adequate description of the work to be performed? ARIZ. REV. STAT. § 33-992.01(C)(1).
2. Was the lien itself signed under oath, by someone with knowledge?

Because of its basic similarity to the many other lien claim issues addressed in the other summary judgments involving other lien claimants, the court will address this issue first.

### A. Whom this Decision Affects

This decision involves the allegations made against RDC Construction, Inc.

4

## B. Arizona Law

In a bankruptcy case, property rights are determined by reference to state law. *Butner v. United States*, 440 U.S. 48 (1979). Bankruptcy courts have "core" jurisdiction to hear and determine issues involving the extent, validity, and priority of liens against an estate. 28 U.S.C. § 157(b)(2)(K).

Mechanics' and materialmen's liens are creatures of statute. ARIZ. REV. STAT. § 33-981, *et seq*. Such statutes have existed in Arizona since statehood. *See, e.g. Arizona Eastern R.R. Co. v. Globe Hardware Co.*, 14 Ariz. 397, 400, 129 P. 1104, 1105 (1913) ("The primary object of our lien law is to insure to the laborer and materialman the payment of their accounts, and incidentally to protect the owner against the filing of liens by such persons against his property for services and material rendered and furnished the original contract."); *see also* CIVIL CODE 1913, § 3639. They exist principally to protect mechanics, materialmen, and those who furnish labor or supplies to another's land, thereby enhancing its value, from the dangers of non-payment. *See United Metro Materials, Inc. v. Pena Blanca Props., L.L.C.*, 197 Ariz. 479, 484, 4 P.3d 1022, 1027 (App. 2000); *Hayward Lumber & Inv. Co. v. Graham*, 104 Ariz. 103, 111, 449 P.2d 31, 39 (1968). These rights are "jealously protected," *Wylie v. Douglas Lumber Co.*, 39 Ariz. 511, 515, 8 P.2d 256, 258 (1932), and when construing them the statutes must be liberally construed to effect their primary purpose. *See In re JWJ Contracting Co.*, 287 B.R. 501, 509-10 (9th Cir. BAP 2002) (construing Arizona's statutes), *aff'd*. 371 F.3d 1079 (9th Cir. 2004); *Ranch House Supply Corp. v. Van Slyke*, 91 Ariz. 177, 181, 370 P.2d 661, 664 (1962). While the statutes themselves appear, on the surface, to contain requirements which can be easily followed, the Arizona courts have held that substantial compliance with the statutes is sufficient to perfect a lien, provided that such compliance is not inconsistent with the legislative purpose. *See, e.g., Lewis v. Midway Lumber, Inc.*, 114 Ariz. 426, 431, 561 P.2d 740, 755 (App. 1977); *Columbia Group, Inc. v. Jackson*, 151 Ariz. 76, 79, 725 P.2d 1110, 1113 (1986); *MLM Constr. Co. v. Pace Corp.*, 172 Ariz. 226, 229, 386 P.2d 439, 442 (App. 1992); *Peterman-Donnelly Eng'rs & Contractors Corp. v. First Nat'l Bank,* 2 Ariz. App. 321, 323, 408 P.2d 841, 843 (1965). While Arizona courts will, from time to time, describe the lien perfection process as one to be strictly followed, *see MLM Constr. Co.*, 172 Ariz. at 229, 836 P.2d at 442 (citing cases), the law's modern evolution has inevitably trended toward the substantial compliance model.

In addition to the protection of mechanics and materialmen, a secondary purpose of the law is to protect the property owner. *See, e.g., Arizona Gunite Builders, Inc. v. Continental Cas. Co.*, 105 Ariz. 99, 101, 459 P.2d 724, 726 (1969). The proper notification and recordation of a mechanic's lien serves to keep invalid or improper clouds on title from impairing an owner's rights to enjoy the benefits of ownership.

As for the specific procedure necessary for a lien claimant to perfect a lien, it must, within 20 days of first furnishing labor, professional services, materials, machinery, fixtures, or tools to the job site, prepare what is designated as a "preliminary twenty day notice" (hereinafter "preliminary 20-day notice") and serve it. ARIZ. REV. STAT. § 33-992.01. This statute was initially enacted in 1979, and has been amended five times since. Once the job is completed, the lien must be recorded within a specific period of time thereafter. ARIZ. REV. STAT. § 33-993.

Within each of these two statutes are contained numerous detailed requirements, some of which are at issue in the instant case. A copy of each of these statutes is included in the appendix to be filed.

<u>Appx. 1</u>    Challenged lien documents

<u>Appx. 2</u>    Statutes:

- Lien for labor services, materials, etc., ARIZ. REV. STAT. § 33-981.
- Priority status, ARIZ. REV. STAT. § 33-992.
- Preliminary twenty day notice, ARIZ. REV. STAT. § 33-992.01
- Procedure to perfect lien, ARIZ. REV. STAT. § 33-993

### C. **Were RDC's Liens "Facially Defective?"**

Aside from a challenge of the most general and inspecific type (OSB's separate motion for partial summary judgment dated April 2, 2007), OSB has provided no significant analysis of its "facially defective" position or response to the arguments made by RDC in reply thereto. It thus appears that OSB is not seriously pursuing these contentions, and perhaps initially expected to gain an easy victory by default.

But default is not to be, and OSB has failed to respond in any meaningful way to RDC's analysis and authorities on such issues.

Nor, really, could it. The undisputed facts are that RDC began its work on Parcel FF on November 22, 2005, and promptly prepared and served its preliminary 20-day notices at that time. (Para. 2, RDC Statement of Facts; para 2, Declaration of George W. Anderson, dated March 19, 2007.) OSB had no loan or lien whatsoever related to Parcel FF on November 22, 2005. It first became a lender as to that parcel on or about April 19, 2006, five months later. This fact has not been contested.

Thus, it seems, as a matter of law, that OSB simply has no standing to make a claim that it was not served with a preliminary 20-day notice, since at the time the preliminary 20-day notice was sent, OSB had no interest in the property. Thus, the court finds that ARIZ. REV. STAT. § 33-992.01 simply did not apply to OSB, and OSB has not provided the court with any authority to support an argument (not made in the pleadings) that RDC had a duty to supplement its preliminary 20-day notices five months later.

Therefore, as to the issue of whether RDC was required to serve a copy upon OSB on November 22, 2005, the court will deny OSB's partial motion for summary judgment on that point, and grant RDC's partial motion for summary judgment. RDC had no legal duty or need to serve OSB with its preliminary 20-day notices.

The next issue concerning "facial validity" follows the same reasoning. Again, OSB did not respond to RDC's points, authorities, or arguments. On the lien claim form itself, Desiree Hale stated, under oath, that she was an authorized agent for RDC for the purpose of setting forth the necessary information required by the lien statutes, ARIZ. REV. STAT. § 33-993.

All that OSB has done, without affidavits to contradict the authority or knowledge of Ms. Hale, is to assert that she is not someone with personal knowledge. Aside from not having shown that to be true, how can OSB contradict her claim that she is speaking on behalf of "the claimant," which is all that the statute requires. ARIZ. REV. STAT. § 33-993(A). As an agent, Ms. Hale's affidavit establishes her authority to <u>speak for</u> the claimant. The statute, upon which OSB relies, states:

> The notice and claim of lien shall be made under oath by the claimant <u>or</u> someone with knowledge of the facts . . . .

ARIZ. REV. STAT. § 33-993(A) (emphasis supplied). The law's most basic definition of an "agent" is:

> One who is authorized to act for or in place of another; a representative. . . .

BLACK'S LAW DICTIONARY, "agent" (8th ed. 2004). Therefore, Arizona's lien statute does not appear to prohibit even a hearsay statement if a person is acting as an agent for the "claimant." And, although neither party discussed the point, it may well be that Ms. Hale's employer, Van Rylin Associates, Inc., is a licensed agency to do exactly what it was doing, attempting to carry out a debt collection act. *See* ARIZ. REV. STAT. § 32-1001, *et seq*.

Additionally, by invoking the "hearsay" rule, OSB fails to take account of the fact that such is a rule of <u>evidence</u>, relating to matters that occur in a <u>court</u> proceeding. Such a rule is not engrafted onto the lien statutes. If it were, the legislature would have to so provide. Arizona's hearsay rule is found at ARIZ. R. EVID. 801. "Hearsay" is defined as:

> . . . . a statement, other than one made by the declarant while testifying at the <u>trial or hearing, offered in evidence</u> to prove the truth of the matter asserted.

ARIZ. R. EVID. 801(c) (emphasis supplied); *see also* FED. R. EVID. 801(c) (same). Equally important, and what OSB has failed to mention, is that its protestations of hearsay is only applicable--as a <u>rule</u>--to "proceedings in <u>courts</u> in the State of Arizona . . . ." ARIZ. R. EVID. 801 (emphasis supplied); *see also* FED. R. EVID. 801. The ultimate point of this discussion is that, when Ms. Hale signed the lien document, she was not involved in a court proceeding, and therefore the "hearsay rule" simply did not apply to her. All that applies is that she either be a "claimant" or "someone with knowledge of the facts." ARIZ. REV. STAT. § 33-993(A).

OSB has not taken issue with, nor demonstrated any legal reason why this court should not accept Ms. Hale's signature as it would any other authorized representatives of RDC, since she was RDC's agent for that purpose.

On the issue of whether Ms. Hale was an appropriate party to sign RDC's claim of lien, the court finds, as a matter of law, that she was so qualified. As a result, OSB's partial motion for summary judgment on this issue will be denied, and RDC's motion for partial summary judgment will be granted.

## SECOND ISSUE - WHETHER OSB HAS AN "EQUITABLE LIEN" WHICH COMES AHEAD OF RDC'S MECHANIC'S LIEN

As for the second major issue, RDC filed a partial summary judgment motion against OSB and the Trustee, on a single issue:

- Is it entitled to a first position lien on Parcel FF, to the extent of $605,003.49? This is the amount of an <u>unreleased</u> claim of lien.

In response thereto, OSB has filed its own motion for partial summary judgment against RDC, contesting the lien priority issue on equitable subrogation grounds. OSB also challenges the accounting method by which RDC has arrived at the amount which RDC claims is due it as an undisputed lien claim.

The Trustee has taken no position on this issue. Nor has WRI joined the fray, and the suggestion has been made that WRI claims no lien against the FF parcels.

### A. Facts

Both RDC and OSB have asked the court to grant partial summary judgment on the issue concerning the priority question.

Of course, in any summary judgment motion, the court may only grant it if there are legal grounds to do so, upon undisputed facts. The court has reviewed the statements of fact (and objections thereto), the documents attached in support thereof, the affidavits of Stephen Loonam and George W. Anderson, and the pertinent administrative record in the consolidated cases.

From all of the evidence, the following facts are either agreed to be material, and/or are undisputed:

1. On or about November 7, 2005, Turner-Dunn Acquisitions, L.L.C. dba Turner Dunn Homes ("Turner Dunn"), as owner, and RDC, as contractor, entered into a Contract Agreement wherein RDC agreed to furnish certain infrastructure to the property known as Parcel FF of the McCartney Center Subdivision in Casa Grande, Arizona ("Parcel FF"), for a contract sum of $1,893,675.20.

2. At that time, Parcel FF was encumbered with a $2 million Deed of trust held by New Century Holdings, L.L.L.P. ("New Century). This was not a construction loan, but had been for acquisition only. Affidavit of George W. Anderson, para. 5, Affidavit dated April 18, 2007.

3. RDC promptly began work on Parcel FF of McCartney Center, and on November 22, 2005, RDC prepared a preliminary 20-day lien notice which was immediately served on Turner Dunn Homes by first class mail. A proof of service of the Arizona preliminary 20-day notice was also prepared and executed before a notary.

4. Also in November 2005, RDC commenced construction on Parcel FF.

5. RDC sent invoices, called "payment applications," to the owner/Debtor dated 11/30/05, 12/31/05, 1/31/06, 3/31/06, 5/31/06, 6/30/06, and 7/25/06. The total amount billed on the Contract was $1,382,981.39.

6. On or about April 10, 2006, OSB, as lender, and Turner Dunn, as borrower, entered into a Loan Agreement.

7. Pursuant to the Loan Agreement, OSB agreed to make a $3,932,500 land loan to Turner Dunn (the "Land Loan"), evidenced by a promissory note and secured by a deed of trust (the "OSB DOT") against Parcel FF.

8. The Loan Agreement expressly provides at Recital B that the Land Loan was "to be used by [Turner Dunn] to fund the refinance of [Parcel FF]," among other things.

9. From the proceeds of OSB's Land Loan, the note to New Century was paid off.

10. OSB did not take an assignment of either New Century's note or deed of trust.

11. Parcel FF does not cross-collateralize OSB on any of the other four Turner Dunn parcels upon which OSB also holds liens, and WRI has no lien claim on Parcel FF.

12. RDC's records reflect an amended contract amount of $2,095,097.20. It claims to still be owed $819,459.38, for which it filed a proof of claim. Affidavit of George W. Anderson, para. 7, dated March 19, 2007.

The following facts are established for purposes of this motion only, and have only tangential relevance for purposes of this Memorandum Decision:

13. The following additional accounting fact is how much RDC <u>claims</u> it is still owed, as part of its secured mechanic's lien against the parcel:

| | |
|---|---:|
| Total services by RDC | $1,382,981.39 |
| Add: lien service fee | 400.00 |
| Less: purported release | <u>778,377.90</u> |
| Unreleased balance due | $ 605,003.49[1] |

14. An issue which is <u>not</u> to be decided in this motion is whether RDC released its lien to the extent of $778,377, and whether such release is effective as against OSB's lien interest. (*See* Ex.6 to Affidavit of Steven M. Cox dated March 8, 2007.)

With regard to the parties' other contentions, they fall into categories best described as disputed, containing conclusions of law, issues that are immaterial, opinions, or legal conclusions. Therefore, the court, for purposes of this motion, has not considered the following numbered paragraphs in its analysis:

| **RDC Facts** | **Reason** |
|---|---|
| Para. 3 | Immaterial; decided above in "facially valid" section |
| Para. 4 | Disputed |
| Para. 6 | Disputed |
| Para. 7 | Disputed |
| Para. 8 | Disputed |
| Para. 10 | Issue of law |
| Para. 11 | Disputed |
| Para. 12 | Disputed |

---

[1] Entitlement to interest, fees, and costs is disputed, and in any event can be calculated and those issues decided at a later time.

| | |
|---|---|
| Para. 13 | Issue of law |
| Para. 14 | Disputed; issue of law |
| Para. 15 | Disputed; issue of law |
| Para. 16 | Immaterial |
| Para. 17 | Immaterial |
| Para. 18 | Immaterial |

| **OSB Facts** | **Reason** |
|---|---|
| Para. 4 | Left for future proceedings |
| Para. 8 | Immaterial |
| Para. 9 | Disputed |
| Para. 10 | Disputed |
| Para. 11 | Disputed |
| Para. 12 | Disputed |
| Para. 13 | Disputed, not as to what the inspector's opinion was, but to the conclusion drawn. The materiality thereof is also a matter to be left to future proceedings. |

### B. Legal Issue and Discussion

Thus, based on the facts recited above, which the parties agree upon as being undisputed, the issue before the court is: Can OSB's later-recorded deed of trust lien spring ahead, and be senior to, the prior recorded mechanic's lien of RDC? Or, do there exist sufficient material disputed issues to prevent summary judgment for either party at this time?

The parties agree that the preliminary notice of RDC's potential mechanic's lien was given five (5) months before OSB recorded its deed of trust against Parcel FF. The court has now also decided, above, that OSB's "facially defective" challenges to RDC's lien validity are without legal merit, and has granted partial summary judgment to RDC on those issues.

OSB, for purposes of its claim for summary judgment, poses one final challenge to the RDC lien. It is whether, pursuant to law, it may assert the right of "equitable subrogation," and take over and

"stand in the shoes of," the prior, now released lien position of New Century. OSB's legal position regarding "equitable subordination" is that its deed of trust should come before RDC's mechanic's lien.

OSB's loan documents do not evidence an assignment of New Century's note and deed of trust. Nor do the OSB loan files which were produced and attached to Mr. Cox's affidavit reflect such an intention. The existence of the loan documents themselves, nor what they say, are not matters that have been disputed by RDC. In fact, many of the OSB loan files on Parcel FF have been placed before the court by RDC (*see* documents attached to Cox Affidavit dated April 18, 2007), or appear in other pleadings in the court's files.

The OSB revolving deed of trust note dated April 10, 2006 ($5,000,000) evidences a new obligation as to Parcel FF, and contains no reference to New Century or any previous lender. The deed of trust recorded against Parcel FF dated April 19, 2006 (Fee No. 2006-056186) is similarly silent as to any pre-existing lender or loan on the property. The 45-page Loan Agreement between OSB and the Debtor dated April 10, 2006, and which concerns a $3,932,500 "Land Loan" on Parcel FF, states nothing about OSB's succession to the prior lien of New Century. Instead, in para. C of the Recitals (p. 1), OSB describes its security as including a "first priority position Deed of Trust." In fact, OSB recorded its <u>own</u> deed of trust upon closing, even though Arizona law expressly provides that "[T]he transfer of any contract or contracts secured by a trust deed shall operate as a transfer of the security for such contract or contracts." ARIZ. REV. STAT. § 33-817. In other words, OSB chose to pay off the prior New Century note, obtain a release of the New Century deed of trust, and then record its own deed of trust against Parcel FF. When OSB agreed with the Debtor that "the laws of the State of Arizona shall govern the interpretation and enforcement of this Agreement" it apparently knew, or was held to know of the existence of the foregoing statute. Thus, had OSB desired to "step into" New Century's shoes, it could have easily, by one or a few simple documents, obtained an assignment of the deed of trust and an endorsement of the note, and done exactly that. Yet, OSB's 45-page single-spaced Loan Agreement nowhere mentions succeeding to New Century's lien position. What it does do, however, is state that the Land Loan is made to the Debtor "to pay for, or <u>reimburse Borrower</u> for the payment of, the <u>acquisition</u> of the Land . . . ." (Loan Agreement dated April 10, 2006 at 5, para. 2.1). It then refers to Exhibit B, which exhibit speaks of a "Land Refinance." In the context of the cumulative loan documents, and the lack of any assignment language, the term "land refinance" means the

payment of an existing loan with the proceeds from a new loan, and not, as OSB now suggests, a mere substitution or exchange of interests. Indeed, the settlement statement through Camelback Title Agency dated April 19, 2006, listed, at line 104: "Payoff to New Century Holdings" in an amount of $2,048,534.16.

That OSB did not intend to "step into the shoes" of New Century, as Mr. Loonam's affidavit states (para. 7, Loonam Affidavit dated April 10, 2007), is also evidenced by the bank's requirement that its Borrower deliver to it an "irrevocable commitment" for title insurance, insuring the validity and <u>priority</u> of the Deed of trust (Loan Agreement at p. 13, para. 7.1.) And eventually, the Borrower is to make sure that the new OSB Deed of trust will have an insured, "valid first and prior lien" subject to certain exceptions, none of which would appear to include any senior position of the New Century refinance. *See also* Loan Agreement at p. 15, para. 7.7.

In support of its legal premise that OSB's deed of trust was intended to "step into the shoes" of the previous lender, OSB's loan officer, Stephen Loonam, has provided the court with a sworn affidavit, in which he states:

> 7. Accordingly, OSB understood that the proceeds of the Land Loan were to be used in part to satisfy the indebtedness secured by the existing Deed of Trust on the Land held by New Century Holdings, L.L.L.P. ("New Century"), and regarded itself as stepping into the shoes of New Century, so that the OSB DOT would have the same lien priority as New Century's Deed of Trust, at least to the extent required to satisfy New Century's Deed of Trust.

Loonam Affidavit dated April 10, 2007. There are several curiosities attached to this statement by Mr. Loonam.

First, the loan documents are entirely silent on this significant concept, and but for Mr. Loonam's statement in the affidavit, is described nowhere else in the extensive loan documents between OSB and its borrower. Therefore, if it is not covered by the documents themselves, it would appear that the entire "stepping into the shoes" concept, as now articulated by Mr. Loonam, is an effort to insert a late modification into the loan documents. If that is so, then it brings this new, and of course legally significant issue, into direct conflict with the Loan Agreement itself, which on p. 42, carries the following language:

> Furthermore, no provision of this Agreement shall be <u>amended</u>, waived, <u>modified</u>, discharged or terminated except by a <u>written</u> instrument <u>signed by the parties</u> to this Agreement.

14

Loan Agreement at p. 42, para. 21.13 (emphasis supplied). There is no such modification in the record. And, finally, as the credibility gap on this issue widens, Mr. Loonam appears to be the authorized officer who apparently must have signed the loan document, because although the court's copy bears only Mr. Loonam's typed name at the end of the Loan Agreement, his name is the only one signing for OSB, in the capacity of Vice President. The court presumes (but is willing to be shown otherwise), that Mr. Loonam indeed executed the Loan Agreement for the bank. It is also possible, and if so, would be an odd coincidence, that the bank has two gentlemen working on this particular loan with the same name. If so, counsel for the bank should promptly correct the court's impression that the Stephen Loonam's signature on both the Loan Agreement (unsigned) and Affidavit is the same individual.

The next document in the OSB file is an April 11, 2006 letter from OSB's Phoenix attorney, Jeffrey J. Miller, in which he routinely describes what is expected of the title officers at the loan's closing. Once again, Mr. Miller's letter nowhere refers to any type of assignment for New Century's note and deed of trust.

Equally important is Mr. Miller's instruction to the title company, consistent with the loan agreement, that the title company is to issue the title policy for the benefit of OSB (subject only to non-material items), which insures its first position lien priority. (Miller letter dated April 11, 2006, p. 2, para. 4.1.)

The title company's settlement statement, at loan closing, reflected that this is exactly how the closing transpired, with the title company receiving from the borrower's disbursement (i.e., the borrower paid for), the sum of $10,509 in order to insure OSB up to $8,932,500 (the $5,000,000 April 10, 2006 revolving deed of trust and note, and the April 10, 2006 $3,932,500 deed of trust and note) insuring that OSB had a valid first lien position. (*See* Settlement Statement dated April 19, 2006.)

This insurance transaction was not atypical of commercial loans of this size and scope. Insuring titles and lien positions is a part of a title company's business, and it receives compensation in the form of premiums for accepting that risk. Having such underwriting is a great comfort to a lender.

There exist other critical facts within both OSB's loan documents, as they affect Parcel FF, and the relationship of that parcel to the Debtors' other parcels. In balancing all of the circumstances, the nature of the Debtors' business is a critical fact. Here, again, the OSB Loan Agreement describes the

purpose for the borrowing as "construction financing" . . . "to fund the construction of a total of eighty-two (82) detached single-family dwelling units on the Land . . . ." (Loan Agreement, Recitals, paras. B and D.) Attached to the Loan Agreement are forms which, *inter alia*, deal with loan disbursement advances or allowed construction formulas, as well as forms for surveying, engineering, architect's, and general contractor's agreements. (*See* exhibits attached to Loan Agreement.) The Loan Agreement also attaches draw request forms for construction draws.

As for OSB's relationship with its borrower(s), OSB was also lending or already had lent, many millions of dollars to the Debtors for their development of other subdivisions adjacent to Parcel FF. The borrowers were in the residential home-building business, and the bank was aware of this essential fact. Residential developers and builders, of necessity, hire other trades and professionals to assist them in this type of endeavor. The recording of, or potential for recording mechanic's liens in such a business is, without question, a reasonable possibility, probability, or expectation. This possibility, then, explains OSB's Loan Agreement insistence on the need for an insured first lien position on its real property collateral. It wished to have no surprises when it came to its lien position.

None of the OSB-generated loan documents mention anything about its "stepping into the shoes" of New Century. Instead, they show that New Century is simply to receive a "payoff" of $2,048,534.16, at closing.

Against this backdrop then, the court now turns to whether OSB has satisfied the legal requirements, as a matter of equity, for the court to declare OSB's deed of trust superior to the prior recorded mechanic's lien of RDC on grounds supporting "equitable subordination."

## C. The Law

ARIZ. REV. STAT. § 33-992(A) prefers mechanics and materialmens liens over those of subsequent encumbrances. The facts in this case, concerning such recording dates, is not at issue. Both parties agree that RDC's lien was five months prior in time to OSB's deed of trust.

Arizona's appellate courts have provided guidance on this issue, and this court's discussion begins with *Mosher v. Conway*, 45 Ariz. 463, 46 P.2d 110 (1935). In that case, Justice Lockwood, speaking

for the court, set forth the basic elements which a junior creditor must show in order to gain a superior position to another's lien.

First, as an equitable remedy, the court must balance the equities, which the Supreme Court simplified as: "[H]e who seeks equity must do equity, and subrogation can only be granted when an equitable result will be reached." *Id.*, 45 Ariz. at 468, 46 P.2d at 112.

Next, one party must pay the debt of another in order to protect his own interest, "which he honestly believes must be paid to accomplish that purpose . . . ." *Id.*, 45 Ariz. at 470. 46 P.2d at 113.

Thus, if those conditions are satisfied, then one, himself a creditor, who has paid another creditor whose claim is preferable to his, may be subrogated to the rights of such other creditor. It is in the act of protecting one's own interest that one becomes entitled to claim equitable subrogation.

The Arizona Court of Appeals, 31 years later, also visited the legal principle, and refined the definition by looking to find either an express or implicit understanding and intent that equitable subrogation was meant to attach a priority to the junior position. *Peterman-Donnelly Eng'rs & Contractors Corp. v. First Nat'l Bank*, 2 Ariz. App. 321, 326, 408 P.2d 841, 846 (1966).

In *Peterman*, the court found from facts, including depositions, that the creditor claiming equitable subrogation had "regarded itself as stepping into the shoes of [the senior creditor]." *Id.* It had no formal assignment of the senior lien, but the court found that, since the intervening mechanics lienholder's rights had remaining "unaffected," that the facts justified imposition of the doctrine.

Twenty years after *Peterman*, the Arizona Court of Appeals had another opportunity to consider the boundaries of equitable subordination. In *Lamb Excavation, Inc. v. Chase Manhattan Mortgage Corp.*, 208 Ariz. 478, 95 P.3d 542 (2004), the court held in favor of a "takeout," or permanent financing lender, over the claims of prior mechanics' lienholders, finding an implied agreement to subrogate, and a "concordant . . . reasonable expectation of receiving a security interest, and when an intervening lien claimant suffers no prejudice." *Id.*, 208 Ariz. App. at 482; 95 P.3d at 546.

In each of the three cases cited, *Mosher, Peterman*, and *Lamb*, the courts allowed the junior creditor's lien interest to be elevated above that of intervening liens which otherwise would have priority interests in the real property. Those cases were consistent in their collective concern for, and focus upon,

the perceived lack of any prejudice to the middle or intervening lienholder. *See, e.g., Lamb*, 208 Ariz. App. at 482, 95 P.3d at 546.

Yet, as the Arizona Supreme Court noted in *Mosher*:

> While the nature and grounds of subrogation are very clear, the difficulty arises in its application to the innumerable complications of business, and no general rule can be stated which will afford a test in all cases for its application. Whether it is applicable or not depends upon the particular facts and circumstances of each case as it arises.

*Mosher*, 45 Ariz. at 468, 46 P.2d at 112. Along such lines, the Arizona Supreme Court observed:

> Its purpose is the prevention of injustice and is the mode which equity adopts to compel the ultimate payment of a debt by one who in justice, equity, and good conscience ought to pay it. It rests upon the principle that substantial justice should be attained, regardless of form.

*Id.* Emphasizing that consideration of "the factual and procedural framework in which the case developed" is "merely to state the obvious," the *Lamb* court acknowledged how the factual developments of any case will, and should dictate the case's ultimate outcome. *Lamb*, 208 Ariz. at 482, 95 P.3d at 546.

In each of these illustrative Arizona cases, the courts ultimately sided with the most junior creditor. But they did so by analyzing all of the facts, and finding that such a result was logical and consistent with Arizona law and policy by balancing the equities and considering the relative harm to each party. *See id.* at 546.

This case, then, by application of the foregoing general rules, can be decided by answering the following questions:

1. Does equity prevail over an Arizona statute?
2. Has equity been shown here with the necessary weight to overcome the statute?
3. Did OSB have a reasonable expectation that its lien would be in first position?
4. Has OSB shown damage or prejudice?

Case 4:06-ap-00106-JMM    Doc 260    Filed 05/18/07    Entered 05/21/07 08:55:51    Desc
Main Document    Page 18 of 20

As for the first question, the court concludes that equity can only supercede a statutory dictate if all of the necessary elements are shown. Otherwise, a mechanic or materialman may rely on the priority of their lien position to come ahead of subsequent encumbrances. ARIZ. REV. STAT. § 33-992. The burden to refute the statutory priority shifts to the junior lienholder to show otherwise, as a matter of equity.

The court next addresses the third question, reserving the second and fourth questions for later discussion. This critical element reflects a concern for the reasonable expectation of the party seeking to come ahead of an earlier interest. In the instant case, while it might appear on the surface that OSB bargained for a senior lien on real property, its principal expectation was that it would be <u>paid</u> on its note. OSB's collateral's priority position, was, of course, a necessary part of that expectation, but OSB (as is normal in transactions of the type involved here) hedged its bets. It also required its borrower to purchase title insurance for it, wherein a third-party insurer would accept the risk of exactly what happened here. Therefore, OSB's expectation of a senior lien position was an insured one, and in doing so, it shifted that risk to the title insurer. For a $10,509 fee, Camelback Title and its underwriters accepted that risk.

Thus, considering the Arizona Supreme Court's admonition that courts must, in equitable subrogation cases, be mindful of the "innumerable complications of business," and consider "the particular facts and circumstances of each cases as it arises," *Mosher* at 468, the court must conclude that OSB had dual expectations. The first was that it could foreclose upon a valid first lien in the event of payment default. But equally important was its second expectation, which was that, if the priority of that deed of trust turned out to be something less, that it could then look to the title policy to the extent of the collateral's value, up to the cap contained within the policy purchased on its behalf.

Such expectations dilute OSB's cries for equitable relief, because those pleas have failed to tell the entire story.

We turn now to questions two and four, above, which are interrelated and which are truly at the heart of the controversy. Because of the existence of title insurance favoring OSB's senior lien position, OSB has neither alleged nor proven any damages by virtue of its later-filed lien. Mr. Loonam's affidavit says nothing about damages, nor informs the court as to the efforts made to collect from the title insurer. Ultimately, this is where the loss, if any, will probably come to rest. The title company accepted

compensation to assume the risk it agreed to underwrite. OSB, because of its prudent business decision, will likely not suffer any harm due to its defective first lien.

Did OSB bargain for a senior position? Of course. Did it also cause title insurance to be purchased for it in order to ensure that the expectation would be met, if the collateral's lien position proved to be defective? Yes, again. Has OSB suffered any harm? No, not according to the papers filed with the court.

And, if OSB's insured lien position is elevated ahead of RDC, will RDC suffer a loss of a preference granted to it by a statute grounded in almost a century of Arizona's most primal laws? Once more, the answer is in the affirmative.

In summary, then, OSB has failed to show, as a matter of equity, that it is deserving of having its inferior lien advanced ahead of the earlier-filed mechanic's lien of RDC.

The court is now comfortable, based on the statutes, cases, facts, documents, and affidavits, to hold that OSB's equitable subordination request should be denied, as a matter of law, based on those portions of the record which are not in dispute. The balance of the issues, as identified by the parties, will await further proceedings or trial.

OSB's motion for partial summary judgment on the equitable subordination issue will be denied, and RDC's partial motion for summary judgment on the same issue will be granted.

### RULING

A separate order will be issued simultaneously with the issuance of this Memorandum Decision. FED. R. BANKR. P. 9021.

DATED this 18 day of May, 2007.

_____
JAMES M. MARLAR
UNITED STATES BANKRUPTCY JUDGE